IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

MILTON R. WATKINS,
      Plaintiff,

vs.                             Case No. 3:08cv255/RV/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq.*  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34, and for Supplemental Security Income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381–83.

      Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed.

I.    PROCEDURAL HISTORY

Plaintiff's applications for SSI and DIB were denied initially (Tr. 38, 40–43, 319)[1] and on reconsideration (Tr. 39, 46–48).  On October 26, 2007, following a hearing, an administrative law judge ("ALJ") rendered a decision in which he found that Plaintiff was not under a "disability" as defined in the Act (Tr. 15–29).  On October 26, 2008, after considering additional arguments and evidence (Tr. 329–46), the Appeals Council of the Social Security Administration denied Plaintiff's request for review (Tr. 5–8).  Thus, the decision of the ALJ stands as the final decision of the Commissioner, subject to review in this court.  Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.    FINDINGS OF THE ALJ

On October 26, 2007, the ALJ made several findings relative to the issues raised in this appeal (Tr. 15–29):

1)    Plaintiff met the insured status requirements of the Act through March 31, 2006.

2)    Plaintiff has not engaged in substantial gainful activity since December 8, 2002, the date he alleges he became disabled.[2]

3)    Plaintiff has the following severe impairments: degenerative disc disease, cervical spine tumor, and spinal cord astrocytoma, which cause significant limitations in Plaintiff's ability to perform activities of daily living or work.

4)    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5)    Plaintiff has the residual functional capacity ("RFC") to perform light work at the unskilled level.  That is, Plaintiff can occasionally lift and carry twenty pounds and frequently lift and carry ten pounds.  He can stand, walk, and sit with normal breaks for about six hours in an eight-hour workday and has an unlimited ability to push or pull.  Plaintiff is precluded from climbing ladders, ropes, and scaffolds, but he can

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on August 27, 2008 (Docs. 10, 11).

[2] Thus, the time frame relevant to Plaintiff's claim for DIB is December 8, 2002 (alleged onset) to March 31, 2006 (date last insured).

occasionally climb ramps and stairs.  Although Plaintiff is precluded from balancing, he can occasionally crawl, crouch, kneel, and stoop.  Plaintiff has no communicative, manipulative, or visual limitations, and Plaintiff has few, if any, environmental limitations, except a need to avoid hazards such as heights and machinery.

6) Plaintiff has no past relevant work.

7) Plaintiff was born on December 11, 1975, and on the date he alleges he became disabled he was twenty-six years old, which is defined as a "younger individual" aged 18–49 (20 C.F.R. §§ 404.1563 and 416.963).[3]

8) Plaintiff has at least a high school education and is able to communicate in English.

9) Transferability of job skills is not an issue because Plaintiff has no past relevant work.

10) In light of Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform.

11) Plaintiff was not under a disability, as defined in the Act, from December 8, 2002, through October 26, 2007, the date of the ALJ's decision.

## III. STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); see also Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983),

---

[3] In general, the legal standards applied are the same regardless of whether a claimant seeks DIB or SSI, but separate, parallel statutes and regulations exist for DIB and SSI claims (see 20 C.F.R. §§ 404, 416).  Therefore, hereafter, citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision.  The same applies to citations of statutes or regulations found in quoted court decisions.

*superseded by statute on other grounds as stated in* <u>Elam v. R.R. Ret. Bd.</u>, 921 F.2d 1210, 1214 (11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); <u>Falge</u>, 150 F.3d at 1322; <u>Lewis</u>, 125 F.3d at 1439; <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); <u>Lewis</u>, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that Plaintiff is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If Plaintiff is performing substantial gainful activity, he is not disabled.

2.      If Plaintiff is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If Plaintiff is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve

months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, Plaintiff is presumed disabled without further inquiry.

4.      If Plaintiff's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if Plaintiff's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

Plaintiff bears the burden of establishing a severe impairment that keeps him from performing his past work. 20 C.F.R. § 404.1512. If Plaintiff establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, Plaintiff must then prove he cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

A.      Personal History

Plaintiff has never been married and has one child, a daughter, who lives with her mother (Tr. 351). Plaintiff characterizes all of his past work as "manual labor," such as work in construction (Tr. 357). Plaintiff last worked in 2001, stacking concrete bags (Tr. 354). Plaintiff held that job for about two to three years, but he left in 2001 when he got "into some trouble and . . . was incarcerated" (Tr. 355). Plaintiff testified that during his incarceration he was hospitalized for five and a half months. When he was released in May 2004 he was "sick," so he applied for disability benefits on May 19, 2004 (Tr. 356–57).

Plaintiff stated that physical activity, such as working around the house, causes severe pain and puts him "in the bed for days at a time," and further, that he can sit for only about fifteen to twenty minutes before experiencing pain in his lower back and buttocks (Tr. 359, 366–67). Plaintiff noted that he has severe headaches and constant pain that goes into his shoulders and extremities, as well as dizziness and occasional numbness in his arms, hands, and legs (Tr. 359–60, 367–70). The numbness makes it difficult for Plaintiff to use his fingers for fine manipulation, such as writing

(Tr. 368). Plaintiff is able to move his head from side to side but not up and down because such movement causes "hard shocking pain" in the neck that radiates outward (Tr. 360). Plaintiff also has lower back pain and pain in his hips and legs, but his head pain is the worst (Tr. 368). Plaintiff testified that he takes methadone for pain, and it helps sometimes, but it does not "completely get rid of the pain" (Tr. 362, 367). Additionally, the methadone causes side effects, such as drowsiness and nausea, although the nausea is helped somewhat by the use of Phenergan (Tr. 362–63).

B.      Relevant Medical History[4]

On March 18, 2002, magnetic resonance imaging ("MRI") of Plaintiff's lumbar spine disclosed "degenerative disc disease of L4-L5 with associated broad based posterior disc bulge of approximately 4 mms in the AP dimension," which may significantly increase if Plaintiff stands or bears weight (Tr. 116). On February 13, 2003, an MRI of Plaintiff's cervical spine disclosed "expansion of the mid cervical spine cord of unknown etiology, [which was] rather pronounced when compared to cord superiorly and inferiorly" (Tr. 115). Further evaluation was recommended (id.).

During Plaintiff's incarceration, he was taken to the office of Bruce C. Raymon, M.D. (see Tr. 117). At Plaintiff's first visit, on March 17, 2003, it was noted that Plaintiff's chief complaint was numbness in both hands and feet, left greater than right, which had started about three months prior and was associated with neck pain (Tr. 118). Plaintiff was able to "toe and heel walk well," cranial nerves II–XII were grossly intact, and reflexes were symmetrical and non-pathological (id.). Motor examination showed some trace weakness in the right intrinsics as compared to the left, but otherwise Plaintiff was "able to exhibit symmetrical and good strength bilaterally in the deltoids, biceps, triceps, hamstrings, gastrocs, and anterior tibs." (id.). Pinprick testing revealed only "decreased sensation in the right fifth digit and all the digits in the left hand as compared to sensation in the upper cervical dermatomes" (id.). Another cervical MRI was obtained on March 24, 2003, and after reviewing the results on April 15, 2003, Dr. Raymon opined that the most likely diagnosis remained intramedullary neoplasm, such as possible atrocytoma or, though less likely, ependymoma (Tr. 117, 121). Further, although a demyelinating process could not be ruled out, Dr.

_____

[4] The court notes that the ALJ's decision contains a rather detailed discussion of Plaintiff's full medical history, and the entire history need not be repeated here because it is not necessary for the resolution of Plaintiff's claims.

Raymon noted that Plaintiff's clinical history suggested no such process (Tr. 117). Dr. Raymon recommended a surgical biopsy (*id.*).

On May 1, 2003, Plaintiff was hospitalized within the Florida Department of Corrections ("DOC"), with a chief complaint of pain in his neck with numbness and tingling in his arms and legs for approximately the prior five months (Tr. 155). The impression upon Plaintiff's admission was a spinal mass, and a neurosurgery consult and repeat MRI were recommended (Tr. 157).

On May 2, 2003, Plaintiff underwent a consultation at Memorial Hospital in Jacksonville, Florida (Tr. 123). Philip Henkin, M.D., noted that Plaintiff presented with a six-month history of weakness and numbness in his hands, worse on the right (*id.*). Plaintiff reported that his symptoms initially started in December of 2002 with some numbness and tingling in his right hand, which had progressively worsened over the last five to six months, and he was now experiencing numbness in his left hand and foot (*id.*). Plaintiff also reported some mild imbalance, ataxia, and neck pain, and he stated that if he flexed his neck he experienced burning and shooting pain down his neck and throughout his body (*id.*). Motor testing demonstrated 5/5 motor strength bilaterally in the upper and lower extremities except for the interossei and intrinsic strength in both hands, which was 4/5 (Tr. 124). Sensation was diminished distally in the right hand, and right grip strength was diminished at 4/5, but proximal strength in Plaintiff's arms and legs was normal, as was distal strength in the legs (*id.*). Dr. Henkin noted that, "Deep tendon reflexes are 1/4 in biceps, triceps and brachial radialis, 3/4 in bilateral quadriceps. Babinski is equivocal." (*id.*). Plaintiff was diagnosed with probable spinal cord tumor. A cervical MRI taken the same day disclosed an "abnormal contrast enhancement within the cervical cord with expansion of the cord, greatest in the mid-cervical cord," the appearance of which was consistent with neoplasm, likely a glioma (Tr. 125).

On May 15, 2003, Plaintiff was admitted to the outpatient department of Memorial Hospital. A spinal angiogram was performed, which revealed a spinal cord tumor (Tr. 127–28).

On May 27 2003, Plaintiff underwent a laminectomy from C3 through C7 for biopsy of a spinal cord tumor (Tr. 130, 132). Plaintiff was discharged to his place of incarceration on May 30, 2003, with a diagnosis of cervical spinal cord astrocytoma (Tr. 130). Upon his discharge, Plaintiff was able to walk without an assistive device and without difficulty, and his motor strength was normal, bilaterally, in both the upper and lower extremities (*id.*).

On June 13, 2003, Plaintiff returned to Memorial Hospital for follow up regarding the laminectomy (Tr. 141). Dr. Henkin reported that the pathologist to whom Plaintiff's sample was referred could not commit to a diagnosis of spinal cord tumor; instead, it was noted that the sample was "hypercellular [and] consistent with either reactive gliosis or well differentiated astrocytoma" (*id.*). Additionally, Plaintiff was noted to be neurologically intact, and another cervical spine MRI was recommended (*id.*).

Records from Shands HealthCare reveal that Plaintiff underwent the recommended MRI on August 15, 2003, and explain that the MRI was necessary to determine the nature of the spinal cord growth (*i.e.*, whether it was an inflammatory lesion or a tumor) since the biopsy was non-diagnostic, and to determine whether the lesion/tumor was growing (Tr. 142, 146–47, 152). After reviewing the MRI results on August 15, 2003, the impression of the radiologist (who did not have prior MRIs available for comparison) was "ill-defined areas of T2 and contrast-enhancement abnormality within [] the cervical cord. These are primarily at the level of the C3-C4. It is uncertain, however it does appear, that the site of the biopsy is separate from the baseline enhancing lesions, but within the area of T2 hyperintensity." (Tr. 142–43). Three days later, on August 18, 2003, William A. Friedman, M.D., reviewed the MRI results and opined that the cervical lesion was smaller and unlikely to be a tumor (Tr. 148). Dr. Friedman recommended referral to the neurology department (*id.*).

Plaintiff was released from hospitalization within the DOC on September 26, 2003, with a discharge diagnosis of "C-Spine tumor" (Tr. 154). It was noted that during Plaintiff's hospitalization he had remained clinically stable and that upon discharge he was alert, oriented, eating and drinking normally, ambulatory with no significant neurological symptoms, and had no significant complaints (*id.*). Plaintiff's discharge medications included Colace, Vioxx, and Effexor (*id.*). Next, on October 7, 2003, an MRI taken within the DOC disclosed a broad based "central and towards the right side" disc protrusion at the L4-L5 level which was mildly compressive upon the thecal sac (Tr. 201).

From October 13, 2003, to October 18, 2003, Plaintiff was again hospitalized at Memorial Hospital after falling and experiencing what he described as an "electric shock feeling to his neck" and down his arm (Tr. 161). Plaintiff reported he collapsed and actually felt paralyzed for several minutes, leaving him unable to move his arms and legs, but eventually sensation returned (*id.*).

Plaintiff stated that he had shooting pain down his hands, and his hands were extremely sensitive to touch and had not responded to pain medications (*id.*). Plaintiff underwent numerous tests during his hospitalization, including daily cervical spine MRIs and other MRIs. For example, on October 15, 2003, a brain MRI was taken and noted to be unremarkable (Tr. 175). On October 17, 2003, a "multimodality evoked potential study" disclosed a normal brainstem auditory evoked response study and a normal visual evoked potential (*see* Tr. 167). However, the study was abnormal to the extent it suggested the presence of a "conduction block in the way of the meniscal pathways when stimulating the left posterior tibial nerve, [which] might be due to the presence of an abnormality in the ipsilateral spinal cord or contralateral brainstem" (Tr. 167). Upon Plaintiff's discharge it was noted that Plaintiff had marked improvement in appearance of the cervical spinal cord, which was reduced in size and normal in caliber (Tr. 159). It was also noted that almost all of the "abnormality enhancements foci in the spinal cord" were resolved (*id.*).

On December 18, 2003, Plaintiff was seen by a physician within the DOC and reportedly was doing fairly well but generally feeling weak (Tr. 195). On January 2, 2004, an MRI of the brain was negative (Tr. 199). On February 12, 2004, an MRI of the cervical spine disclosed dramatic improvement in the size and signal intensity of the spinal cord, as compared with an earlier study, with no evidence of abnormal signal intensity to suggest residual tumor or underlying myelitis (Tr. 192). On March 4, 2004, James Sheppard, M.D., a DOC physician, diagnosed Plaintiff with a history of cervical myelitis, etiology unclear (Tr. 190–91). Because of the unclear etiology, Dr. Sheppard was unable to completely exclude positive multiple sclerosis, although it seemed unlikely and no specific treatment was recommended (Tr. 191).

On May 12, 2004, Edward Valenstein, M.D., with Shands HealthCare, evaluated Plaintiff at the request of the DOC (Tr. 203). Plaintiff reported that since October 2003 he was having episodes of severe numbness related to neck flexion or rotation, as well as tingling in his hands and legs and other related issues, such as headaches, loss of strength, difficulty walking, and hypersensitive forearms (*see* Tr. 203–04). Dr. Valenstein was only able to review the February 2004 cervical spine MRI, which he characterized as "nearly normal" (Tr. 203). He opined that Plaintiff "had an episode of rapidly progressive neurological dysfunction localized to the spinal cord with an image [from August 2003] that suggested a fairly diffuse cervical spinal cord abnormality" (Tr. 205).

He further noted, that "[a]lthough initially there was concern about spinal cord tumor because of apparent cord enlargement and signal abnormality that persisted for more than four months, it is clear now that this has largely resolved, so the problem must have been inflammatory" (*id.*). Dr. Valenstein opined that multiple sclerosis was "in the differential," but spinal fluid examination did not support the diagnosis, and Plaintiff had a normal brain scan (*id.*). He also noted that numerous conditions were within the "differential of myelopathy," so further studies would be helpful (*id.*). Dr. Valenstein further stated that Plaintiff had considerable resolution, "certainly by MR scan," and he was impressed that Plaintiff's neurological examination, although not normal, was quite good (*id.*). Lastly, Dr. Valenstein reported that Plaintiff would need neurologic follow up and should be encouraged to increase his activities (*id.*).

On August 2, 2004, Plaintiff (who was no longer incarcerated) presented to Manuel C. Abendan, M.D., with complaints of neck pain (Tr. 224). Dr. Abendan noted at this visit that Plaintiff should be referred to "neuro/pain management" (*id.*), and at Plaintiff's second visit, that he should be referred to a pain management physician (*see* Tr. 223). On August 12, 2004, upon referral from Dr. Abendan, Plaintiff presented to Cesar L. Llanera, Jr., M.D. (Tr. 207). Plaintiff advised Dr. Llanera that he had chronic neck pain with radiation into the shoulders and interscapular region, which Plaintiff rated as an eight on a ten-point scale ("8/10"); daily headaches with intermittent left facial numbness; shortness of breath; and low back pain with radiation into the hips and thighs, which he rated as 7/10 (Tr. 207–08). Plaintiff stated that physical activity, such as prolonged standing or walking, caused an increase in pain and that rest sometimes provided pain relief, but his pain never went away completely (Tr. 207). Following an examination of Plaintiff's cervical spine, lumbar spine, and right shoulder, Dr. Llanera diagnosed Plaintiff with chronic posterior neck pain with radiation to both upper extremities, secondary to cervical spinal cord tumor (astrocytoma), and chronic low back pain, secondary to degenerative disc disease of the lumbar spine (Tr. 209). Dr. Llanera recommended a neurological evaluation to assess Plaintiff's condition, noting that he could not offer anything further to Plaintiff without such an evaluation, but he did prescribe medications to Plaintiff that would last one month, including Lortab, Flexeril, Salicylate, and Medrol Dose Pack (*id.*).

Plaintiff was treated by F. M. Bumagat, M.D., from November 10, 2004, to July 27, 2007 (Tr. 246–62, 294–314).[5]  At Plaintiff's first visit, on November 10, 2004, he brought some medical records for Dr. Bumagat's review (Tr. 257).  He also told Dr. Bumagat that he was experiencing neck pain, headaches, and lower back pain (*id.*).  Plaintiff was assessed with astrocytoma of the cervical spinal cord and chronic back pain, and he was given a dose of Medrol Dose-Pak and prescribed Lortab (Tr. 258).  Dr. Bumagat ordered an MRI, complete blood count, and comprehensive metabolic profile (*see id.*).  Plaintiff returned on November 29, 2004, at which time Dr. Bumagat indicated that the MRI did not really reveal any visible evidence or signs of spinal cord lesion, although Plaintiff continued to complain of pain in his back with radiation to his lower extremities (Tr. 256).[6]  Dr. Bumagat noted that Plaintiff was on methadone-10-mg twice daily for pain, and he had a long discussion with Plaintiff regarding his disability form (*id.*).  Dr. Bumagat indicated that he would fill out the form because of Plaintiff's pain, "which is intractable [and Plaintiff] is unable to obtain any gainful employment" (*id.*).  Dr. Bumagat also opined that Plaintiff was "completely disabled" (*id.*).  On January 14, 2005, Plaintiff complained of headaches and constant neck pain (Tr. 255).  He stated that his symptoms had been ongoing for two years and generally had not improved or worsened (*see id.*).  Plaintiff also reported that prednisone "helps," providing relief for about one to three months, but then Plaintiff needs the Medrol, which improves his pain (*see* Tr. 254–55).  Dr. Bumagat opined that Plaintiff had a cervical spinal lesion which was probably inflammatory in nature.  Dr. Bumagat further noted that Plaintiff was in no acute distress but had discomfort in his neck, worse with flexion and extension (Tr. 254).  Dr. Bumagat stated that Plaintiff could not be referred to a neurologist due to a lack of insurance, but in the meantime he would continue Plaintiff on his present regimen of methadone and prednisone until additional studies were done (*id.*).  Progress notes dated March 15, 2005, characterize Plaintiff's condition as "chronic intractable neck and back pain which has an unusual feature [*i.e.*,] [t]owards the end of the month

---

[5] Dr. Bumagat's records through June 7, 2005 (Tr. 246–62), were before the ALJ at the time of Plaintiff's hearing.  Dr. Bumagat's remaining records, which begin with a treatment record dated July 14, 2005 (Tr. 294–314), were provided to the ALJ after Plaintiff's hearing.

[6] On a subsequent visit, Dr. Bumagat noted that, although there was no evidence of a cord lesion, the MRI showed central abnormalities in the cord at C5 and C6 (Tr. 254).

he will have numbness and pins and needles sensation with associated nausea and sick like feeling that goes to his head" (Tr. 252). Dr. Bumagat noted that these "Symptoms have been present now for the last two years and appear[] to respond to Prednisone Dose-Pak. The Dose-Pak will last for about three weeks and after that he will start having symptoms of it again and when given the Dose-Pak all the symptoms disappear." (*id.*). It was noted, however, that Plaintiff additionally had chronic neck and back pain for which he takes methadone (*id.*). On physical examination Plaintiff was in no acute distress, but he had marked tenderness in the muscles of the neck and pain on range of motion of the neck (*id.*). Dr. Bumagat continued to treat Plaintiff with prednisone, the Medrol Dose-Pak, and methadone (*id.*). On April 15, 2005, Plaintiff called Dr. Bumagat's office, and his prescriptions were renewed over the phone (*see* Tr. 251). On May 13, 2005, Dr. Bumagat indicated that Plaintiff presented for his "unusual problem of stinging," numbness, and dizziness (Tr. 249). The remainder of the May 13 notes are similar to those concerning Plaintiff's previous visit, except they indicate that Plaintiff was vomiting uncontrollably (*see* Tr. 249). On May 25, 2005, Plaintiff called Dr. Bumagat's office requesting a letter stating that he was unable to work due to his medical condition, and a notation on the record indicates that the letter was provided to Plaintiff's attorney on May 27, 2005 (*see* Tr. 248).

A "Pain Assessment and Documentation Tool," which, although undated, was before the ALJ at the time of Plaintiff's hearing (*see* Tr. 3, 247), reflects Plaintiff's reported pain level on average during the last week/month as 7/10, and his pain level at worst during the past week/month as 10/10 (Tr. 247). Plaintiff further indicated that 60% of his pain had been relieved with medication, the pain relief he was receiving from his current medication was enough to make a real difference in his life, and he had no side effects from his current medication except "moderate" nausea (*see id.*). The last record from Dr. Bumagat, before the ALJ at the time of Plaintiff's hearing, is a Clinical Assessment of Pain form (*see* Tr. 4, 292). On this form Dr. Bumagat opined that Plaintiff's pain was "present to such an extent as to be distracting to the adequate performance of work activities" and that "medication side effects can be expected to be severe and to limit [Plaintiff's] effectiveness due to distraction, inattention, drowsiness, etc." (Tr. 292).

The remainder of Dr. Bumagat's records were provided to the ALJ after Plaintiff's hearing, including a record dated July 14, 2005 (*see* Tr. 3, 314). At that time Plaintiff presented to Dr.

Bumagat with complaints of neck pain with numbness and tingling, which required monthly use of the Medrol Dose-Pak (Tr. 314). Plaintiff also complained of chronic pain, for which he took methadone (*id.*). His prescriptions were renewed (*id.*).

On July 20, 2005, Dr. Bumagat completed another Clinical Assessment of Pain form and reached the same conclusions regarding Plaintiff's pain and the side effects of his medication (Tr. 313; *see also* Tr. 292). On August 12, 2005, Dr. Bumagat completed a Physical Capacities Evaluation (Tr. 312). On this form he opined that in an eight-hour workday Plaintiff could sit and "stand/walk (combined)" for less than one hour and sit and "stand/walk (combined)" for a total of two hours (*id.*). He further opined that Plaintiff could occasionally lift and carry up to five pounds; use his hands for repetitive actions such as simple grasping and pushing and pulling of arm controls, but not for fine manipulation; use his feet for repetitive movements; and occasionally bend, crawl, or reach, but he could not squat or climb (*id.*). Plaintiff was not precluded from activities involving unprotected heights, moving machinery, driving automotive equipment, or involving exposure to marked changes in temperature and humidity, but he was precluded from activities involving exposure to dust, fumes, and gases (*id.*).

Plaintiff returned on August 15, 2005, at which time Dr. Bumagat indicated that Plaintiff was primarily in his office to have disability forms completed (Tr. 311). Dr. Bumagat also noted that the Medrol was helping, as Plaintiff had no more episodes or worsening of his back pain toward the end of the month despite continued chronic back pain (*see id.*). On January 13, 2006, Dr. Bumagat discussed Plaintiff's earlier complaints of episodes of "electric shock" when he turned his head, but he noted that Plaintiff had no such episodes since he had been on prednisone continuously (Tr. 310). Moreover, a physical examination revealed that Plaintiff was in no acute distress, and his extremities showed no edema (*id.*). Plaintiff was diagnosed with chronic intractable back pain and nausea (*id.*). In March 2006, Dr. Bumagat opined that Plaintiff's condition was essentially unchanged, noting that prednisone continued to control the electric shock sensation and that Plaintiff was doing "pretty much better"; nevertheless, Plaintiff continued to complain of nausea occurring about one to two times a week (Tr. 309). His medications were continued (*id.*). In June 2006, Plaintiff reported that his pain had worsened and was now all day long rather than intermittent; it therefore appeared to Dr. Bumagat that Plaintiff's present medications were not providing adequate control (Tr. 308). Plaintiff

also advised Dr. Bumagat that he had run out of his medication, and although he was unsure, he thought he might have taken extra doses or someone in his family might have taken some (*id.*). Plaintiff further stated that when he ran out, he went to an emergency room and was provided with twelve samples of methadone (*id.*).  A physical examination showed no definite weakness, and reflexes were apparently intact (*id.*).  Dr. Bumagat recommended a cervical spine MRI and nerve conduction studies of the upper extremities (*id.*).  On August 15, 2006, Plaintiff reported his back pain as 7/10, but noted that when he took methadone it went down to 2/10 or 3/10 and he was functional (Tr. 307).  On September 14, 2006, Dr. Bumagat noted that Plaintiff's chief complaint concerned his chronic intractable back pain, for which he took methadone and prednisone (Tr. 306). He also noted that Plaintiff's pain was essentially unchanged and that on physical examination he was in no acute distress (*id.*).  Plaintiff's methadone was continued, as was the prednisone, but the prednisone was decreased to 7.5-mg daily (*id.*).

A second Pain Assessment and Documentation Tool was completed in September 2006 (*see* Tr. 305–06).  Plaintiff's reported pain level on average during the last week/month was 4/10, and his pain level at worst during the past week/month was 8/10 (Tr. 305).  Plaintiff further indicated that 80% of his pain had been relieved with medication, the pain relief he was receiving from his current medication was enough to make a real difference in his life, and he had no side effects from his current medication except "mild" constipation and nausea (*see id.*).  Plaintiff had no other side effects, such as "mental clouding" (Tr. 305).  Lastly, the pain form states that Plaintiff had no episodes of reported lost or stolen medication (*id.*), even though Plaintiff had previously reported missing medication (*see* Tr. 308).

Plaintiff returned to Dr. Bumagat on October 13, 2006 (Tr. 304).  Dr. Bumagat noted that Plaintiff's chronic back pain was "secondary to an expansive cord lesion in the past," but even though the lesion had apparently disappeared Plaintiff continued to complain of the same amount of pain, noting that the pain is characterized by numbness in the right arm and increasing neck pain (Tr. 304).  Upon physical examination, Plaintiff did not seem to be in any acute distress (*id.*). Methadone was continued, and the prednisone was decreased to 5-mg daily (*id.*).  Office notes from November 2006 are similar, but Plaintiff's prednisone was increased to 7.5-mg daily following this visit because Plaintiff reported being unable to turn his head without a feeling a shock-like sensation

in his spine and constant headache after the decrease to 5-mg (Tr. 303). On physical examination Plaintiff, again, was noted to be in no acute distress (*id.*). On January 5, 2007, Plaintiff reported fluctuating pain depending on his activity, with some difficulty concerning balance, dizziness, and forgetfulness (Tr. 302). A physical examination disclosed essentially normal findings but some neck tenderness and pain on flexion and extension (*id.*). Plaintiff's diagnosis remained chronic intractable neck pain (*id.*). Notes from February 22, 2007, are essentially the same as those from January 5, 2007, but it was noted that Plaintiff "appears to be steady" on 7.5-mg of prednisone, and he was "getting some adequate relief with his Methadone" (Tr. 301). Thus, Plaintiff's prescriptions were renewed (*id.*). Notes from March 2007 are similar to previous notes but additionally reflect that Dr. Bumagat had a long discussion with Plaintiff about the risk of taking methadone; he agreed to continue Plaintiff's prescription but noted that Plaintiff should consider switching to Opana in the future (Tr. 300). On April 2, 2007, Dr. Bumagat noted that Plaintiff's pain was "really manageable now" on his medications, and Plaintiff had no episodes of shocking sensations on continuous prednisone (Tr. 299). Physical examination again disclosed essentially normal findings (*id.*). On May 2, 2007, Dr. Bumagat indicated that Plaintiff was stable and had no side effects from his medications, although he had been experiencing some pain (Tr. 298). On June 1, 2007, Plaintiff's condition was noted to be essentially unchanged (Tr. 297). On June 28, 2007, Dr. Bumagat reported that Plaintiff's back pain was unchanged but well controlled with his present dosage of methadone (Tr. 296). He also noted that Plaintiff had no side effects from the medications, and the same medications were continued (*id.*). On July 27, 2007, it was again noted that Plaintiff was responding well to prednisone and methadone, that he had no side effects from those medications, that a physical examination was essentially normal, and that Plaintiff was in no acute distress (Tr. 295).

C.      Consultative Examinations

On August 20, 2004, at the request of the Division of Disability Determinations for the State of Florida ("DDD-FL"), Plaintiff underwent a neurological evaluation by Daniel Bader, M.D. (Tr. 210). Plaintiff was diagnosed with cervical spinal cord lesion of uncertain type and questionable multiple sclerosis (Tr. 210–13). Dr. Bader indicated that he had reviewed only some of Plaintiff's medical records, including records from Memorial Hospital, and he recommended that the remaining

records be provided for further analysis and evaluation (Tr. 210, 213). The record does not reflect that the remaining records were provided to Dr. Bader or that he provided a supplemental opinion.

On January 8, 2007, Plaintiff was examined by C.W. Koulisis, M.D., an orthopaedic surgeon, at the request of the DDD-FL (Tr. 274). A physical examination was essentially normal (*see* Tr. 275–78), but Dr. Koulisis declined to assess Plaintiff's physical capacities, noting that it was inappropriate to do so without referring Plaintiff to a neurologist and obtaining follow-up testing, such as an MRI and a central spinal fluid analysis (*see* Tr. 276). The record does not reflect that Plaintiff was referred to a neurologist or that follow-up testing was conducted (or if this occurred that updated information was provided to Koulisis) or that he provided a supplemental opinion.

On May 22, 2007, Plaintiff was examined by Dale K. Johns, M.D., a neurosurgical surgeon, at the request of the DDD-FL (Tr. 281). Plaintiff explained his medical history, including his earlier diagnosis of cervical astrocytoma and subsequent decrease in the size of the lesion, and he reported current complaints of pain and his treatment by Dr. Bumagat (*id.*). Next, Dr. Johns conducted a thorough physical examination of Plaintiff, the results of which are detailed in the opinion of the ALJ (*see* Tr. 24–26; *see also* Tr. 282–84). Plaintiff was then diagnosed with probable myelitis, similar to Guillain-Barre syndrome, or possibly due to a demyelinating disease (Tr. 284). Dr. Johns opined that a mass lesion seemed extremely unlikely, particularly a malignant one, but he specifically indicated that "[a]n up-to-date MRI and flexion and extension x-rays of [Plaintiff's] neck would be helpful in making a more accurate diagnosis" (*id.*). As with Dr. Bader and Dr. Koulisis, however, the record contains no indication that follow-up studies were conducted, or if conducted, that the results were provided to Dr. Johns; nor does the record contain a supplemental opinion from Dr. Johns. Notwithstanding, Dr. Johns opined that Plaintiff was precluded from lifting or carrying twenty-one to fifty pounds, but he could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds (Tr. 285). He further opined that "at one time without interruption" Plaintiff could sit three hours, stand three hours, and walk four hours, and that during an eight-hour workday Plaintiff could sit a total of eight hours, stand six hours, and walk five hours (Tr. 286). Dr. Johns also offered opinions regarding Plaintiff's abilities to use his hands and feet, perform certain postural activities and activities of daily living, and be exposed to certain

environmental limitations (Tr. 287–90), the details of which are not necessary for a resolution of Plaintiff's claims.[7]

## V.    DISCUSSION

Plaintiff raises four issues in the instant appeal (*see* Doc. 13).  First, Plaintiff contends the ALJ erred in rejecting the opinions of Dr. Bumagat, a treating physician.  Second, Plaintiff asserts the ALJ erred in rejecting his complaints of disabling pain.  Third, Plaintiff alleges the ALJ erred in finding that there are a significant number of jobs existing in the national economy which he can perform.  Fourth, Plaintiff contends the ALJ was biased.

### A.    The Opinions of Dr. Bumagat and Plaintiff's Credibility[8]

The ALJ rejected the opinions of Dr. Bumagat and found that Plaintiff's complaints were less than fully credible (*see* Tr. 27).  Plaintiff contends that the ALJ erred in making each of these findings because the reasons underlying the findings lack substantial support in the record (*see* Doc. 13 at 1, 7–18).

#### 1.    Evaluation of the Opinions of Treating Physicians

Substantial weight must be given to the opinion, diagnosis, and medical evidence of a treating physician unless there is good cause to do otherwise.  *See* Lewis v. Callahan, 125 F.3d 1436, 1439–41 (11th Cir. 1997); Edwards v. Sullivan, 937 F.2d 580, 583 (11th Cir. 1991); Sabo v. Chater, 955 F. Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527(d).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  Phillips v. Barnhart, 357 F.3d 1232, 1240–41 (11th Cir. 2004) (citation omitted).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See* Edwards, 937 F.2d at 580 (finding that the ALJ properly discounted treating physician's report where the physician

---

[7] The court notes, however, that if Dr. John's opinions are accepted as true, Plaintiff would not be precluded from performing work at the light exertional level (*see* Tr. 287–90; *see also* Tr. 27, 371–82 (testimony of the Vocational Expert)).

[8] As discussed more fully *infra*, the ALJ's discussion regarding Plaintiff's credibility and the opinions of Dr. Bumagat is combined.  The undersigned finds it helpful to do the same here.

was unsure of the accuracy of his findings and statements). Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See* <u>Wheeler v. Heckler</u>, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also* <u>Schnorr v. Bowen</u>, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) medical evidence supporting the opinion; 4) consistency with the record as a whole; 5) specialization in the medical issues at issue; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion is entitled to more weight than a consulting physician's opinion. *See* <u>Wilson v. Heckler</u>, 734 F.2d 513, 518 (11th Cir. 1984); *see also* 20 C.F.R. § 404.1527 (d)(2). Lastly, the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole. *See* <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)). "The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." <u>Oldham v. Schweiker</u>, 660 F.2d 1078, 1084 (Former 5th Cir. Unit B Nov. 1981).

        2.        Evaluation of a Claimant's Credibility

As this court is well aware, pain is treated by the regulations as a symptom of disability. Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms." *Accord* 20 C.F.R. § 416.929. In <u>Hand v. Heckler</u>, 761 F.2d 1545, 1549 (11th Cir. 1986), the Eleventh Circuit adopted the following additional pain standard:

> There must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from the condition or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain.

The Eleventh Circuit continues to follow the <u>Hand</u> test.  <u>Wilson v. Barnhart</u>, 284 F.3d 1219 (11th Cir. 2002); <u>Kelley v. Apfel</u>, 173 F.3d 814 (11th Cir. 1999); <u>Elam</u>, 921 F.2d at1216; <u>Holt v. Sullivan</u>, 921 F.2d 1221, 1223 (11th Cir. 1991); <u>Martin v. Railroad Retirement Bd.</u>, 935 F.2d 230, 233 (11th Cir. 1991).

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." <u>Wilson</u>, 284 F.3d at 1226.  Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.  But, "[w]hile both the regulations and the <u>Hand</u> standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." <u>Elam</u>, 921 F.2d at 1215.  The court has held that "[p]ain alone can be disabling, even when its existence is unsupported by objective evidence." <u>Marbury v. Sullivan</u>, 957 F.2d 837, 839 (11th Cir. 1992) (citing <u>Walker v. Bowen</u>, 826 F.2d 996, 1003 (11th Cir. 1987)).  However, the absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  <u>Id.</u>; <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, "[i]f the Commissioner refuses to credit [subjective testimony of the plaintiff concerning pain] he must do so explicitly and give reasons for that decision. . . .  Where he fails to do so we hold as a matter of law that he has accepted that testimony as true." <u>MacGregor v. Bowen</u>, 786 F.2d at 1054; <u>Holt</u>, 921 F.2d at 1223.  "Although this circuit does not require an explicit finding as to credibility, . . . the implication must be obvious to the reviewing court." <u>Dyer v. Barnhart</u>, 395 F.3d 1206, 1210 (11th Cir. 2005) (internal quotations and citations omitted).  Moreover, the credibility determination need not cite to particular phrases or formulations, "but it cannot merely be a broad rejection which not enough to enable" the reviewing court to conclude that the ALJ considered a claimant's medical condition as a whole.  <u>Id.</u>  The reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  <u>Jones v. Dep't of Health and Human Serv's</u>, 941 F.2d 1529, 1532 (11th Cir. 1991).

Lastly, underlying the <u>Hand</u> standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment

of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain." Scharlow v. Schweiker, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms and complaints"). Claimants with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others. "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain. This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ." Hand, 761 F.2d at 1548–49. It is within the ALJ's "realm of judging" to determine that "the quantum of pain [a claimant] allege[s] [is] not credible when considered in the light of other evidence." Arnold v. Heckler, 732 F.2d 881, 884 (11th Cir. 1984). Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that. The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

3.      ALJ's Findings Regarding Dr. Bumagat's Opinions and Plaintiff's Credibility

In rejecting the opinions of Dr. Bumagat, the ALJ stated that he was assigning "significant evidentiary weight" to the "well reasoned" opinions of Dr. Johns, including his opinion that Plaintiff is capable of performing work at the light exertional level (Tr. 27). And, in finding Plaintiff less than fully credible, the ALJ generally noted that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely credible (id.). In support of each of these findings, the ALJ specifically stated as follows:

> Dr. Bumagat has continued to prescribe the narcotic Methadone, while the whole time his office notes indicate that [Plaintiff] was in no acute distress, which the undersigned finds is inconsistent.
>
> After considering the evidence of record, the undersigned finds that [Plaintiff's] medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.
>
> The undersigned notes that, while [Plaintiff's] complaints may have seemed credible at the onset of his symptoms of a spinal cord lesion, notes in the file disclose that the lesion had decreased in size and [Plaintiff's] symptoms of pain associated with the

lesion had lessened, which is entirely opposite of Dr. Bumagat's opinion; therefore, the undersigned finds that [Plaintiff] has acted out the pain symptoms to garner Methadone, which can be addicting. That alone negates [Plaintiff's] credibility.

(*id.*).

As can be seen from the foregoing quote, the ALJ appears to have combined into one discussion his reasons for discounting the opinions of Dr. Bumagat and for finding Plaintiff less than fully credible. It also appears that the ALJ relied on the same reasons to discount Plaintiff's complaints and to reject the opinions of Dr. Bumagat. While it would have been preferable for the ALJ to discuss the issues separately, it was not improper for the ALJ to base his findings on the same reasons, as long as those reasons have substantial support in the record.

As to the first reason, the ALJ correctly noted that Plaintiff generally was not in "acute" distress during his office visits with Dr. Bumagat. Rather, Plaintiff's pain was consistently noted to be chronic, ongoing, or intractable (*see* Tr. 252, 256, 258, 293, 296–304, 306–12, 314).[9] And, despite Plaintiff's repeated complaints of ongoing and intractable pain and his reports of pain reaching levels as high as "10/10" (*see, e.g.*, Tr. 247), Dr. Bumagat's treatment notes do not reflect that he ever observed Plaintiff experiencing acute pain. Plaintiff's complaints are therefore inconsistent with Dr. Bumagat's observations. Notwithstanding, the ALJ appears to have additionally concluded that Dr. Bumagat should not have prescribed methadone because he never observed Plaintiff in acute distress. In so concluding, the ALJ effectively substituted his opinion for the opinion of Dr. Bumagat, who clearly believed that methadone was an appropriate medication for the treatment of Plaintiff's chronic pain—regardless of whether Plaintiff was in acute pain at the time of his office visits. In this regard, the ALJ erred, and therefore the first reason stated by the ALJ for rejecting Plaintiff's complaints and/or the opinions of Dr. Bumagat has only partial support in the record.

The ALJ next found that Plaintiff's spinal cord lesion decreased in size, a finding that has substantial support in the record. Indeed, the record reveals that the lesion was first detected by an MRI in February 2003, but an October 2003 MRI revealed that it was smaller, and by February 2004

---

[9] "Acute," as defined by <u>Taber's Cyclopedic Medical Dictionary</u> (21st Edition 2009), means "[h]aving rapid onset, severe symptoms, and a short course; <u>not chronic</u>" (emphasis added).

an MRI revealed "dramatic improvement" in the size of the lesion, and Plaintiff's condition was characterized as "nearly normal" and "largely resolved" (Tr. 115, 159, 203, 205). Thus, the objective medical evidence is inconsistent with Plaintiff's complaints because it documents substantial improvement in Plaintiff's condition, and the ALJ did not err in considering this factor. *See* 20 C.F.R. § 404.1529(c) (although not determinative of a claimant's credibility alone, an ALJ is permitted to consider the objective medical signs and laboratory findings, or lack thereof, when determining a claimant's credibility). As before, however, the ALJ's finding is only partially supported by the record because the ALJ additionally stated that Plaintiff's symptoms of pain associated with the lesion had lessened along with the decrease in the size of the lesion. Contrary to the ALJ's statement, the record generally reveals that Plaintiff's reports of pain did <u>not</u> lessen during the relevant time frame.[10] For example, in January 2005 Plaintiff complained of headaches and constant neck pain, and he stated that his symptoms had been ongoing for two years and generally had not improved or worsened (*see* Tr. 255); in June 2006 Plaintiff reported that his pain had worsened and now existed all day long rather than intermittently, and it appeared to Dr. Bumagat that Plaintiff's medications were not providing adequate control (Tr. 308); and in September 2006, Dr. Bumagat noted that Plaintiff's chief complaint concerned his chronic intractable back pain (Tr. 306). Even the Commissioner has acknowledged that Dr. Bumagat was "aware that even though Plaintiff's spinal cord lesion had disappeared, <u>he continued to complain of pain as before</u>" (Doc. 18 at 9 (referencing Tr. 304 (a treatment note dated October 13, 2006, containing Dr. Bumagat's observation that Plaintiff's lesion had disappeared, but Plaintiff continued to have the same amount of pain)) (emphasis added). Although Dr. Bumagat's most recent treatment records reflect improvement in Plaintiff's pain (*e.g.*, Dr. Bumagat noted in April 2007 that Plaintiff's pain was "really manageable now" (Tr. 299), and in June 2007 that Plaintiff's back pain was unchanged but well controlled (Tr. 296)), these notations were made after the relevant period for Plaintiff's DIB claim (December 8, 2002, through March 31, 2006), and near the end of the five-year relevant period for Plaintiff's SSI claim (December 8, 2002, through October 26, 2007). Thus, the

---

[10] The ALJ also found that Plaintiff exaggerated his symptoms to continue getting methadone, which is seemingly inconsistent with his finding that Plaintiff's complaints of pain had lessened.

record does not substantially support a finding that Plaintiff's complaints of pain lessened during the time frame most relevant to this appeal.

Lastly, the ALJ stated that Plaintiff "acted out" his pain symptoms to garner methadone, and that alone negates his credibility. The ALJ, however, has not clearly articulated his basis for this finding. To the extent the finding is based on the earlier reasons stated by the ALJ, such as a lack of objective medical evidence, it is only partially supported by the record (as previously discussed). To the extent the finding is based on some other factor, the ALJ's reasoning is not evident from the opinion. *See* SSR 82-62 ("The rationale for a disability decision must be written so that a clear picture of the case can be obtained. The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion."); Green v. Shalala, 51 F.3d 96, 101 (7th Cir. 1995) (to permit an informed review, ALJ must articulate his analysis of the evidence); Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991) ("It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence . . . "). Thus, it matters not whether "there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff engaged in drug-seeking behavior," as the Commissioner asserts (Doc. 18 at 7), because the ALJ failed to articulate sufficient grounds for reaching this conclusion. *See* Zblewski v. Schweiker, 732 F.2d 75, 78–79 (7th Cir. 1984) (while strong grounds may have existed for rejecting claimant's testimony, ALJ's failure to articulate reasons for doing so precludes meaningful appellate review); Cline, 939 F.2d at 565.

Similarly, to the extent the Commissioner urges this court to uphold the ALJ's findings based on other factors, such as Plaintiff's conservative treatment, his resistance when Dr. Bumagat attempted to switch him from methadone, and inconsistencies between Plaintiff's reports to Dr. Bumagat and Plaintiff's statements or testimony (Doc. 18 at 5–7, 9–10), the undersigned notes that these factors have been articulated by the Commissioner in the instant appeal, not by the ALJ below. This court's review is limited to a review of the ALJ's conclusions of law and findings of fact, including whether the findings of fact are supported by substantial evidence. *See* Martin, 894 F.2d at 1529 (district court's review of the decision below is "demarcated by a deferential reconsideration of the findings of fact and an exacting examination of the conclusions of law"). Thus, having conducted a deferential reconsideration of the ALJ's opinion, including his findings of fact and

conclusions of law, the undersigned concludes that the ALJ's findings regarding Dr. Bumagat's opinions and Plaintiff's credibility are only partially (as opposed to "substantially") supported by the record. The decision below, therefore, cannot be affirmed.

In Social Security cases, the role of this court is to determine whether the law has been properly applied and whether substantial evidence supports the Commissioner's findings, not to find facts. Because of this limited role, the general rule is to reverse and remand for additional proceedings when errors occur. *See, e.g.*, Davis v. Shalala, 985 F.2d 528, 534 (11th Cir. 1993) (referring to general practice); Foote, 67 F.3d at 1562 (stating that an insufficient credibility finding is "a ground for remand when credibility is critical to the outcome of the case") (emphasis added); Salter v. Astrue, Case No. 3:08cv189/RV/EMT (N.D. Fla. May 22, 2009 (Doc. 15)) (same). A case may be remanded for an award of disability benefits, however, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. Davis, 985 F.2d at 534; *see also* Bowen v. Heckler, 748 F.2d 629, 636 (11th Cir. 1984) (if the Commissioner's decision is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the decision with or without remanding the case for a rehearing); Carnes v. Sullivan, 936 F.2d at 1219 ("The record . . . is fully developed and there is no need to remand for additional evidence."); MacGregor, 786 F.2d at 1053 (where Commissioner does not discredit or make any findings regarding the weight of a treating physician's opinions, the opinions must be accepted as true).

Here, the ALJ did not ignore Dr. Bumagat's opinions or Plaintiff's complaints (or apply an incorrect pain standard);[11] he merely made insufficient findings in rejecting them. Moreover, some of the ALJ's findings have substantial support in the record. This court cannot determine, however, whether those findings with substantial support—standing alone—are sufficient to uphold the ALJ's overall findings regarding Plaintiff's credibility and Dr. Bumagat's opinions. Furthermore, the evidence in the record does not establish disability without any doubt, such that remand for an award of benefits would be appropriate, especially considering that the ALJ relied on the opinions of Dr.

---

[11] In considering Plaintiff's credibility, in pertinent part, the ALJ referenced the appropriate regulation (*see* Tr. 18 (citing 20 C.F.R § 404.1529)) and found evidence of underlying medical conditions, including degenerative disc disease, cervical spine tumor, and spinal cord astrocytoma (*see* Tr. 17).

Johns in finding Plaintiff "not disabled" (as previously discussed, the ALJ accepted the opinions of Dr. Johns, a one-time consultative examiner, over those of Dr. Bumagat). Dr. Johns, however, stated that additional studies were necessary for an accurate diagnosis, and no such studies were conducted. Similarly, the other two consultative examiners, Dr. Bader and Dr. Koulisis, stated their need for follow-up records or studies in order to form conclusive opinions, yet no such follow up occurred. Although the ALJ did not rely on the opinions of Dr. Bader or Dr. Koulisis, it is evident that if the ALJ intended to reject Dr. Bumagat's opinion, further development of the record was necessary because each of three consultative examiners offered less-than-definitive opinions. Thus, remand for further administrative proceedings is appropriate.

Upon remand, the ALJ should be directed to reconsider Plaintiff's credibility and Dr. Bumagat's opinions. If the ALJ again rejects the opinions of Dr. Bumagat, he should not rely on the opinions of any of the consultative examiners unless the record is further developed, and definitive opinions of the consultative examiner(s) are obtained.

B.      ALJ's Findings at Step Five

As an additional ground for relief, Plaintiff contends that the ALJ erred in finding that there are a significant number of jobs existing in the national economy which Plaintiff can perform (Doc. 13 at 1). The ALJ's findings at Step Five, however, are based on his rejection of the opinions of Dr. Bumagat (*see* Tr. 27, 382). Because this case is being remanded for reconsideration of those opinions, the court need not address this claim.

C.      Bias of the ALJ

Lastly, Plaintiff contends that during the administrative hearing on September 7, 2007, the ALJ "clearly revealed his bias against" Plaintiff, and in support, he identifies several comments made by the ALJ during the hearing (*see* Doc. 13 at 19–21). Plaintiff appears to assert that on this basis alone the case should be reversed and remanded for a new administrative hearing before a different ALJ (*id.* at 21).

A suggestion of judicial bias is a strong accusation, not to be taken lightly. Beard v. TMG Life Ins. Co., 966 F.2d 1441 (4th Cir. 1992) (unpublished opinion). "The ALJ plays a crucial role in the disability review process . . . [and the] impartiality of the ALJ is thus integral to the integrity of the system." Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996) (holding that bias was shown

where ALJ, without evidentiary support, noted that a certain physician "almost invariably" found counsel's clients disabled). Mere disagreement with an adjudicator's finding, or a showing of impatience, though, is not enough to show bias. Where the record shows that an adjudicator is severely prejudiced against the defendant, however, reversal is warranted. Sandstrom v. Butterworth, 738 F.2d 1200 (11th Cir. 1984) (holding that where an attorney was referred to by the trial judge as "rude and nasty" and "acting like an animal," that he was "sick of" him, and that his law partner was a "little creep," court showed severe prejudice and should not have presided at contempt proceeding). However, a trial judge's "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women . . . sometimes display" are not enough to establish bias. Liteky v. United States, 510 U.S. 540, 555–56, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474 (1994).

In support of his claim of bias, Plaintiff first notes that during his hearing the ALJ mentioned that Dr. Bumagat's last treatment note was over two years old and that he was going to "ignore" Dr. Bumagat's opinion regarding the extent of Plaintiff's chronic pain (Doc. 13 at 19 (referencing Tr. 361, 363)). Plaintiff further notes that his counsel advised the ALJ that updated medical records had been requested but not yet received, and that in response the ALJ stated, "If they're not here - - they're not here, and I'm not going to hold this hearing up." (*id.* (referencing Tr. 364)).

Although the ALJ did state he was going to "ignore" Dr. Bumagat's opinions, he stated he was going to ignore them because no there were no treatment notes to support them (Tr. 363–64). And, when the comment is placed in context, it appears that the ALJ was largely referring to the opinions on the Clinical Assessment of Pain form that "side effects can be expected to be severe and limit [Plaintiff's] effectiveness due to distraction, inattention, drowsiness, etc." (*see* Tr. 292, 362–64; *see also* Tr. 375). Further, as the ALJ noted, Dr. Bumagat's records do not support the opinion because they contain no reports by Plaintiff of "severe" side effects (*see, e.g.*, Tr. 249, 252, 254, 258). The only indication of side effects in the treatment records (that were before the ALJ at the time he made the comment) is a notation that Plaintiff suffered from "moderate" nausea (*see* Tr. 247). Additionally, although Plaintiff testified during his hearing that he experienced drowsiness as a side effect (*see* Tr. 363), Dr. Bumagat's records contain no such report by Plaintiff (*see, e.g.*, Tr. 247). Thus, to the extent the ALJ rejected Dr. Bumagat's opinions regarding side effects because

they were not supported by the treatment records, the ALJ's reasons for doing so were well founded, and his rejection of the opinions does not demonstrate bias.[12]

Additionally, the ALJ's comment regarding "ignoring" the opinions followed Plaintiff's testimony that his medication made him drowsy and nauseated <u>and</u> an inaudible question posed by the ALJ, to which Plaintiff responded affirmatively (*see* Tr. 363). It therefore appears that the ALJ's decision to ignore certain opinions was also based on Plaintiff's testimony regarding medication side effects (some of which is refuted by Dr. Bumagat's treatment records) and Plaintiff's response to the inaudible question. Because the question is inaudible, and the ALJ's comment immediately followed Plaintiff's response to the inaudible question, the court cannot conclude that the ALJ had no had no legitimate basis to discount the opinions (indeed, as previously noted, the record suggests otherwise), much less conclude that the opinions were "ignored" because the ALJ was biased against Plaintiff.

The court likewise finds no evidence of bias with regard to the ALJ's other statement, that "If [Dr. Bumagat's updated medical records] are not here - - they're not here, and I'm not going to hold this hearing up." The ALJ's comment was made during the midpoint of Plaintiff's hearing, after Plaintiff's counsel informed the ALJ that he had requested updated records but had not yet received them (*see* Tr. 363–64). While the ALJ might have seemed annoyed upon learning that records were missing and reluctant to "hold up" the hearing at that point, his annoyance and reluctance appear justified, given that Plaintiff's counsel was specifically asked by the ALJ before Plaintiff's hearing began whether he would require any additional time to provide further evidence, and Plaintiff's counsel said "no" (Tr. 349). Moreover, at the conclusion of Plaintiff's hearing the ALJ provided Plaintiff's counsel with approximately ten (10) days to obtain and provide updated records (*see* Tr. 383). And, following Plaintiff's hearing the updated records were accepted by the

---

[12] Although the ALJ did not have updated records from Dr. Bumagat at the time of Plaintiff's hearing, the updated records also refute Dr. Bumagat's opinions on the pain assessment. For example, those records reflect Plaintiff's report of no severe side effects from his medication and only "mild" constipation and nausea (*see* Tr. 305), as well as specific indications by Dr. Bumagat that Plaintiff had <u>no</u> side effects from his medications (*see, e.g.*, Tr. 295–96).

ALJ and considered by the ALJ, as they are fully summarized in his opinion (*see* Tr. 26–27). Plaintiff, therefore, has not demonstrated bias on the part of the ALJ.

Plaintiff next alleges that the ALJ posed a lengthy hypothetical question to the Vocational Expert ("VE"), during which he insinuated that Dr. Bumagat consistently diagnosed Plaintiff with chronic pain to "defend" his prescribing of narcotic pain medication and stated that he did not think Dr. Bumagat's updated treatment notes would be very different from the notes already in the record because the notes "don't change all the way through" (Doc. 13 at 19 (referencing Tr. 375–76)).

Initially, the court acknowledges that Plaintiff's characterization of the ALJ's hypothetical question and comment regarding the treatment notes is accurate (*see* Tr. 375–76). The court cannot conclude, however, that the record demonstrates that the ALJ was "severely prejudiced" against Plaintiff, such that reversal would be warranted. *See* <u>Sandstrom</u>, 738 F.2d at 1200. As previously noted, the ALJ received and considered Dr. Bumagat's updated treatment records; the fact that the ALJ expected them to be generally the same as the records before him at the time Plaintiff's hearing does not demonstrate bias against Plaintiff. The ALJ's other comment regarding Dr. Bumagat's "defense" of his decision to prescribe pain medication, however, was unnecessary and improper, and if this factored into the ALJ's decision to reject Dr. Bumagat's opinions, the ALJ erred.[13] It need not be decided here, however, whether the ALJ actually considered this factor because the ALJ committed other errors in evaluating the opinions of Dr. Bumagat, and the undersigned has previously determined that this case should be remanded for reconsideration of his opinions.

The remaining issue concerns whether this case should be assigned to a different ALJ upon remand. Despite the ALJ's improper comment, the undersigned concludes that reassignment is not warranted. The ALJ's comment suggests his disapproval of Dr. Bumagat's methodologies, diagnoses, prescriptions, and/or opinions, but upon remand the ALJ is being directed to reconsider Dr. Bumagat's opinions and to further develop the record in this regard.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **REVERSED**, that the Commissioner be ordered to **REMAND** this case to the Administrative

---

[13] The ALJ's written opinion does not indicate that he relied on this factor, but his comment suggests otherwise.

Law Judge for further proceedings consistent with this Report and Recommendation, and that the Clerk be directed to close the file.

At Pensacola, Florida this <u>7</u><sup>th</sup> day of August 2009.


<u>/s/ Elizabeth M. Timothy</u>
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

**Any objections to these proposed recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**